CAZEAUX v. NEW ORLEANS PUBLIC SERVICE, INC.

——

(April 13, 1931. Opinion and Decree.)
(May 11, 1931. Rehearing Refused.)

——

Alex W. Swords, of New Orleans, attorney for plaintiff, appellant.

Ivy G. Kittredge, of New Orleans, attorney for defendant, appellee.

JANVIER, J. Plaintiff seeks to recover from the local street car company for damage sustained by her through the death of her husband, which she alleges was caused by the negligent operation of a street car by a motorman employed by said company.

The court below, after hearing the evidence, rendered judgment dismissing plaintiff's suit, and from that judgment plaintiff has appealed. The matter was before us once before on appeal from a judgment of the trial court sustaining exceptions of no cause of action. On that appeal we reversed the judgment of the trial court and held that the allegations of the petition, if true, did disclose a cause of action. See Cazeaux v. N. O. Public Service, Inc., 14 La. App. 320, 124 So. 685.

The accident occurred in St. Peter street very near to the upper river corner of the intersection of that street with Broad street. Broad street is very wide, has a neutral ground in the center with a paved driveway on each side, and on the neutral ground is located a street car track of defendant company. St. Peter street crosses Broad, and the street car track at that corner turns from the neutral ground of Broad into St. Peter. A street car going up Broad street must turn to its left at St. Peter and continue on its course in St. Peter street towards the Mississippi river. This makes it necessary that a street car pursuing such a course, which was the course which was being followed by the car involved in the accident with which we are now concerned, must cross the river side driveway of Broad street before entering St. Peter.

Cazeaux, the deceased, evidently intended boarding the street car, and for that purpose had stepped from the sidewalk on the upper side of St. Peter street a few feet into the roadway, so that, when the car should complete the turn into St. Peter street and come to a stop, he might be sufficiently near to board it.

As the car on its uptown course neared the St. Peter street turn, there were at least four automobiles proceeding downtown on the river side driveway of Broad street, and it was thus necessary that these stop for the car, or that the car stop and allow them to pass. The first of the automobiles was a Ford coupe, which was being driven about four feet from the neutral ground of Broad street. Behind it and a little to the right was a truck driven by one Albert Bazile. Behind these two vehicles were two others.

As the street car commenced to turn from Broad into St. Peter street, apparently there was some danger of a collision between it and the approaching Ford coupe, as the attention of most of those who later testified in the case was attracted by the ringing of the gong of the street car.

The Ford came to a stop after slightly turning to the right, and the street car then, at a speed of from four to five miles an hour, continued to cross the Broad

street driveway and was just entering St. Peter street, when the truck, which had been following the Ford, and which was being driven at a speed approximating twenty miles an hour, was swerved by its driver to the right into the same direction as that in which the street car was then proceeding, the chauffeur thereof evidently realizing that he could not bring it to a stop and apparently hoping to avoid a collision with the street car by driving alongside it into St. Peter street.

Unfortunately, however, Mr. Cazeaux was standing directly in the path of the on-coming truck, which struck him, knocked him to the ground, and then crashed into the right side of the street car.

Both vehicles came to a stop a few feet beyond the spot at which the unfortunate man had been standing.

In her petition plaintiff charges that her husband had been standing in Broad street and not in St. Peter street, and that this was made necessary by the bad condition of the surface of the latter street, which she charges was so muddy that a prospective passenger could not stand thereon. The evidence, however, overwhelmingly rebuts her allegations on this point and leaves no room for doubt that the actual facts were as we have outlined them. It is charged that the motorman of the street car was negligent in permitting the car to continue on its course across the Broad street driveway without affording to vehicles on that driveway time to cross ahead of it, or to come to a stop, and that he was also at fault in that, even if the driver of the truck was negligent, nevertheless he (the motorman), by exercising caution, could have brought his slow moving street car to a stop, which would have afforded

Cazeaux an opportunity to step out of the path of the on-coming truck by jumping on to the tracks ahead of the street car.

Defendant maintains that deceased was guilty of negligence on his own part in standing in the street when it was not necessary for him to do so, and also that the motorman was in no way at fault in assuming that the truck could do as the automobiles had done and could stop without the necessity of turning into St. Peter street.

There is one very important fact which is scarcely in dispute, and that is that the brakes on the truck in question were so defective as to be almost worthless. The evidence shows that tests made immediately after the accident disclosed that the brake pedal could be depressed entirely, with little, if any, noticeable effect.

The questions presented for our determination are the following:

First. Was the motorman at fault in creating or in contributing to the dangerous situation?

Second. After the danger was apparent, was there an opportunity for the motorman to avoid the accident?

Of course, if the motorman was at fault in creating or in contributing to the danger of the situation, the question of whether he had or had not the last clear chance to avoid the accident would be of no importance, because where there are joint tort-feasors, as a result of the negligence of two or more of whom another person is injured, neither of the joint tort-feasors can be heard to say, in defense of an action by the injured party, that the other negligent party had the last clear chance to avoid it. If both contributed to the

ultimate result, both would be liable to the third party. Shield v. F. Johnson & Son Co., 132 La. 773, 61 So. 787, 47 L. R. A. (N. S.) 1080. In order, therefore, for defendant to defeat the action by plaintiff in this case, it is necessary that defendant show either that its motorman was not at fault at all and did not contribute to the accident, or that, after the dangerous situation had come into existence and after there was no longer an opportunity for the motorman to avoid it, the deceased Cazeaux could have done so by the exercise of due care on his part. We first will consider the question of whether the motorman was guilty of negligence.

We cannot lose sight of the fact that the leading car, the Ford coupe, was brought to a stop without collision with the street car. If it had crashed into the street car, or if the truck following the coupe had crashed into it, as a result of the necessity of coming to a sudden stop, and if that necessity had been caused by the carelessness of the motorman in running his car across the thoroughfare in the face of approaching traffic, then it would be reasonable to assume that the motorman's negligence was the cause of the collision. But here we find that the Ford at the head of the line of traffic stopped. The truck following did not crash into it, but succeeded in passing around it. It did not continue on its course down Broad street and did not crash into the street car from that direction, but turned to its right, proceeded across the remaining width of Broad street, and did not strike the street car until it had traveled some 25 or 30 feet more than the Ford traveled. The motorman, even if he did not display due regard for the rights of the Ford, was certainly justified in assuming that, as the Ford was able to stop, the vehicles following could do so, since they had considerably more available space than had the Ford. He could not be charged with knowledge of the defective condition of the brakes of the truck. He was justified in assuming that those brakes were in reasonably good condition, and it is very evident that, had the brakes been in good condition, the driver of the truck would have stopped it and would not have found it necessary to turn into St. Peter street. The motorman, then, did not, by continuing across the street, create or contribute to the danger of a collision with the truck, which danger was caused, as we have said, solely by the negligent operation and defective condition of the truck.

However, even though the danger came into existence solely as the result of the negligence of some one else, still the defendant company would be liable for the resulting damage, if, after the danger was imminent and apparent, the motorman still had an opportunity to prevent the fatal result, for it is the duty of an employee toward a prospective patron of his employer to do all that is reasonably possible to assist in extricating the patron from danger, even though the danger may not have been created by the employee. Grennon v. N. O. Public Service, Inc., 10 La. App. 641, 120 So. 801.

But the evidence here shows that when the truck, going at a rather high speed, turned to its right in an effort to pass alongside the slow moving car, the front end of the car had already entered St. Peter street, so that the truck must have approached the street car to some extent from its rear, or, at least, from a position which would have prevented the motorman seeing it, unless he was facing almost towards the rear of the car, as there was no reason for him to do, since, while

it is true that a motorman must see such occurrences as take place either in front of the car or within a reasonable distance away from the track (Payette v. N. O. Public Service, Inc., 10 La. App. 300, 120 So. 483), surely he need not look to his rear to see that no fast moving vehicle coming from that direction crashes into his car.

That the truck approached the street car more or less from its rear and after it had almost completed the turn is also shown by the testimony of the motorman, who states that, when he first noticed the truck, the front end of the street car "was about two feet past the gutter of the river side" of Broad street and the truck was "about 20 feet from the intersection."

There is no doubt at all that the street car stopped almost immediately and that it did not strike the deceased. Therefore, when it became apparent that the truck was unable to be stopped, the front end of the street car was already practically abreast of deceased, and it stopped immediately thereafter. Nothing the motorman could have done would have been effective in preventing the tragedy which followed.

Since we find that the motorman was not at fault either in creating or contributing to the dangerous situation, or in failing to avoid the accident after the danger of it became apparent to him, it is, of course, unnecessary that we discuss the question of whether or not the deceased himself was guilty of negligence on his own part.

The judgment appealed from is affirmed.

HIGGINS, J. (dissenting). My views are not in accord with the majority opinion, and I shall state the case as I see it.

A widow brings this action to recover damages from the defendant for the death of her husband, alleged to have resulted through the negligence of its employee in running him down at the intersection of Broad and St. Peter streets, this city, on August 16, 1926, at 1:30 o'clock p. m.

The petition alleges, in substance, that after the motorman on the street car was apprised of the deceased's perilous and dangerous position, and had an opportunity of avoiding the accident by stopping the car, he negligently and carelessly continued on his course, causing the deceased to be knocked down and crushed so badly that he died instantly.

The defenses are that the motorman was free from any fault, and that the deceased was knocked down and killed by the truck of one Albert Bazille, and, in the alternative, a plea of contributory negligence.

There was judgment dismissing plaintiff's suit, and she has appealed.

The trial court originally dismissed the suit on an exception of no cause of action, and we reversed that judgment and remanded the case for trial on its merits. Cazeaux v. N. O. Public Service, Inc., 14 La. App. 320, 124 So. 685.

The record shows that defendant's street car was proceeding on Broad street in the direction of Canal street. Broad street has a neutral ground in the center with paved roadways on each side, traffic moving towards Canal street using the lakeside thoroughfare and vehicles going in the direction of the Industrial Canal using the river side roadway. Broad street intersects St. Peter street at right angles, and the latter street is unpaved. The street car tracks on which the car in question was traveling turned from off the neutral ground of Broad street across the riverside roadway of Broad street into St. Peter

street in the direction of the river. The deceased had been waiting on the uptown river sidewalk for the purpose of boarding the street car, and, as it approached the intersection of the two streets, and started to turn into St. Peter street, he walked out on the river roadway of Broad street several feet, preparatory to boarding the car. As he did so, four automobiles approached from his left rear side on the river side thoroughfare of Broad street, moving toward the Industrial Canal. When the motorman of the street car saw these automobiles approaching, apparently apprehending that there was danger, he sounded his gong loudly and rapidly; in fact, to such an extent that several of the passengers in the street car became alarmed and stood up. The first automobile was a Ford coupe, and the driver of it brought it to a sudden stop, in time to avoid colliding with the street car, but it was necessary, in doing so, to slightly turn it to the right. The driver of the truck, which was a little to the right of the Ford coupe, apparently believing he was unable to stop in time to avoid a collision with the street car, swerved the truck into St. Peter street, toward the river. The speed of the truck at that time was estimated at 20 or 25 miles an hour. The street car was going about five miles an hour. The motorman did not attempt to stop the street car until he was within two feet of the river sidewalk curb. The left front hub cap of the truck struck the right front step of the street car, both being carried by the momentum into St. Peter street, the truck coming to a stop with the left front wheel jammed against the right front step of the car and its right rear wheel against the sidewalk curb on the river uptown corner. The car stopped with its rear 3 or 4 feet in the river road-

way of Broad street. It appears that the truck first struck the deceased and knocked him down and that both vehicles carried his body into St. Peter street. He was removed to the sidewalk and died instantly.

The riverside thoroughfare of Broad street is about 21 feet wide, and the street car is about 31 feet in length, so that, as the street car turned at the intersection, it blocked the roadway completely.

The evidence of the plaintiff's witnesses and defendant's witnesses is hopelessly in conflict. The two eyewitnesses of the plaintiff testified that the deceased had walked from the sidewalk into the river roadway of Broad street several feet, and that, as the street car and the automobiles and truck came in close proximity, the motorman began shouting: "Hey! Hey!" with the result that the deceased became confused and stepped back into the path of the on-coming truck. They further testified that the body of the deceased was under the front of the street car, facing down, with the left side against the right front wheel, but that it had not passed over the body. It also appears from their testimony that the street car was about approaching the center of the riverside thoroughfare of Broad street at the time the motorman began to shout, and that, as the street car was going very slowly, he could have stopped the car immediately, but that he did not do so and continued on his course.

The defendant's witnesses' version of the accident is that the deceased was standing on the sidewalk waiting for the street car to approach, and, as it started to turn into St. Peter street from Broad, he stepped off the sidewalk and approached the tracks, evidently with the view of board-

ing the car; that he was about adjacent to the sidewalk curb in the mouth of St. Peter street; that the truck approached at a rapid rate of speed and ran down the deceased, carrying his body in front of the truck into St. Peter street, that the left front wheel of the truck struck the right front step and fender of the street car, and that the truck came to rest with its left front wheel on the deceased's body, with the right rear end jammed against the uptown river sidewalk curb.

The evidence of the defendant's witnesses is conflicting as to how far the street car had proceeded into the river roadway of Broad street at the time that it was apparent that the truck was not going to stop. The motorman testified that, when the front part of the car was 4 feet past the gutter curb in St. Peter street, he realized that the truck was not going to stop, and that he then applied his brakes. He is corroborated by some of the defendant's other eyewitnesses; but Joseph Eads, a bridge tender in the service of the defendant, testified as follows:

"Q. Tell what you saw?

"A. I was sitting in the third seat on the right hand side of the Broad car and when it turned into St. Peter street from Broad, I heard the gong ringing unusually more than it does and the two ladies sitting in front of me jumped up and I sat still and I saw this truck 10 or 12 feet away coming towards the car. If it had come straight it would have hit the car, but it turned into St. Peter street and the truck hit the car on an angle and the back trucks were against the gutter curb on the river side and his front wheel was against the car fender. When I saw the man the truck was knocking him down and he was fighting off the truck with his right hand and hollering to beat the band and the car ran up against him and stopped on top of him. That is, the truck. * * *

"Q. When you first saw the truck 10 or 12 feet away, was it going uptown or downtown?

"A. Downtown.

"Q. On what side of Broad street?

"A. The river side.

"Q. Where was the front end of the car where the conductor stands?

"A. Half way across the driveway. It had not straightened out yet. It had not gotten on straight track yet. * * *

"A. I heard the gong ringing unusually more than it does and the two ladies sitting in front of me jumped up and I sat still, and I saw this truck 10 or 12 feet away coming toward the car. * * *

"A. The front end of the car where the conductor (motorman) stands was half way across the driveway."

The defense witness Fury testified as follows:

"Q. Where were you when you saw the accident—between what blocks?

"A. Between St. Peter and Toulouse.

"Q. Is Toulouse below or above St. Peter?

"A. Above, towards Canal street.

"Q. What did you first see?

"A. I was driving down Broad street and there was a machine in front of me and then there was a truck and another car in front of the truck and as we approached Broad and St. Peter, the street car was making the turn and the Ford ahead had to face out St. Peter to let the car go by, and the truck that was in front of the Ford turned with the car into St. Peter, and I pulled my machine to the gutter and the accident happened and I got out of my machine and ran to the corner and as I ran to the corner I saw a man laying under the front wheel of this big truck and I helped shove the truck back and move the man to the sidewalk and he died two minutes after we moved him to the sidewalk. * * *

"Q. You say the truck passed an automobile?

"A. No, sir, I did not say it passed it. I said there was an automobile in front of the truck and the automobile in front of the truck had to turn its face to St. Peter street not to strike the car, and

this truck that was behind it, not to strike the street car turned into St. Peter street."

Andrew Jolly, the conductor of the car, corroborates the defense witness, Eads, about the time of the ringing of the bell. He says:

"Q. What first attracted your attention that something unusual was happening?
"A. I heard some people hollering and heard the motorman hitting his gong pretty rapidly and at that time I was punching transfers.
"Q. You heard the gong?
"A. Yes, sir.
"Q. Was it ringing ordinarily or unusual?
"A. A little faster than usual attracted my attention.
"Q. Do you know whether the motorman was sounding his bell or not sounding it, as he left Broad street and started around this curve?
"A. He was sounding it fast. That is what attracted my attention."

The testimony of this witness clearly shows negligence on the part of defendant's motorman. He was bound to have seen the on-coming vehicles, and while it is conceded that a street car has a right to turn off a neutral ground and cross a roadway of a right of way street, such as Broad street, it must do so in such a manner as not to endanger the life and property of motorists or pedestrians by obliging motorists using that highway to make sudden stops and swerve their vehicles in order to avoid collision.

It appears that it would have been impossible for the street car to have been 4 feet past the river sidewalk curb into the mouth of St. Peter street at the time that the truck ran into the car, as stated by the motorman, because both the plaintiff's and defendant's witnesses all agree that the left front wheel of the truck came into collision with the right front step of the street car, and that the right rear wheel of the truck was jammed against the uptown river sidewalk curb.

Accepting the version of the accident as given by either the plaintiff's witnesses, or the defendant's witnesses, or both of them, it seems to me that the deceased had placed himself in a position where both the motorman and the driver of the truck did see, or should have plainly seen, him; that both of these parties unquestionably saw the truck and street car, respectively; that both of them realized, or should have realized that, if they continued on their respective courses, a collision between these vehicles would be inevitable; that the deceased was in a position of imminent danger of being seriously injured and probably killed. It was, or should have been apparent to them, that the deceased was in a perilous position, without any opportunity of extricating himself, if both vehicles continued on their courses. The motorman knew that the street car was going directly across the path of the on-coming automobiles and that its length of 31 feet would completely block the 21-foot street. In spite of this fact, with an obvious dangerous situation before him, he elected to continue across. The Ford coupe blocked the truck from turning to the left. The driver of the truck had one of two alternatives—either to crash into the side of the street car, or turn into St. Peter street toward the river —in order to avoid a collision.

I am of opinion that both the truck driver and the motorman were guilty of carelessness and negligence. It was through their joint and concurrent negligence that the deceased was killed. Conceding that the deceased was guilty of negligence in going into the street, I believe that the motorman had the last clear chance of avoiding the accident by stopping his car

when he was 10 or 12 feet from the river side sidewalk of Broad street, which would have allowed ample space for the truck to have proceeded on its course. Johnson v. Boyle, 5 La. App. 362; Kelly v. Ludlum, 9 La. App. 57, 118 So. 781; Gouzien v. Feraci, 2 La. App. 115; Martin v. Zatarain, 7. La. App. 629; Greer v. Hamilton, 3 La. App. 120; Parlongue v. Leon, 6 La. App. 18; Thornhill v. Yellow Cab Co. of Monroe, 6 La. App. 787; Green v. Moore, 4 La. App. 495; Kelly v. Schmidt & Zeigler, Ltd., 142 La. 91, 76 So. 250; Hodges v. Davis, 7 La. App. 327; Reed v. Sievers, 146 La. 391, 83 So. 685; Hogan v. N. O. Public Service, Inc., 16 La. App. 637, 131 So. 756; Santos v. Duvic, Court of Appeal, Par. of Orleans, decided March 23, 1931, 133 So. 399, not yet reported (in State reports); Shield v. Johnson & Son Co. et al., 132 La. 773, 61 So. 787, 47 L. R. A. (N. S.) 1080.

But, says counsel for defendant, the proximate cause of the accident was the defective brakes on the truck, and the motorman had a right to assume that its brakes were good. This contention is accepted as sound by my associates. The evidence does show that the brakes on the truck were defective, and I so find that as a matter of fact; but the defective brakes of the truck, while contributing to the accident, were not the sole proximate cause thereof, because it appears from the record that the motorman was guilty of negligence in driving the street car across the path of the on-coming truck, without any regard for the safety of the deceased, who was plainly in a position of danger. The motorman could have stopped the car after he apprehended the danger and failed to do so.. Under the circumstances I am of the opinion that the defendant is liable, and I therefore respectfully dissent.